UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NICHOLAS JOHN SMIT,

    Petitioner,

v.

J. LIZARRAGA, Warden,

    Respondent.

)
)
)
)
)
)
)
)
)
)
)

NO. EDCV 16-233-RSWL (AGR)

ORDER ACCEPTING FINDINGS
AND RECOMMENDATION OF
MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition for Writ of Habeas Corpus ("Petition"), the other records on file herein, the Report and Recommendation ("Report") of the United States Magistrate Judge, Petitioner's Objections and Petitioner's proposed First Amended Petition for Writ of Habeas Corpus. The Court has engaged in a *de novo* review of those portions of the Report and Recommendation to which objections have been made. The Court accepts the findings and recommendation of the magistrate judge, and addresses Petitioner's new grounds and evidence below.

## I.

## PETITIONER'S OBJECTIONS

Petitioner filed objections and submitted new evidence. (Dkt. No. 36.)

Petitioner also filed a state habeas petition before the California Supreme Court with the additional evidence. (Dkt. No. 37.) That state petition contained two grounds for relief: (1) ineffective assistance of counsel; and (2) actual innocence. The California Supreme Court summarily denied the petition on June 12, 2019. *In re Smit*, 2019 Cal. LEXIS 4480 (June 12, 2019).

The Court exercises its discretion to consider the new evidence. The Petition already contains a ground for relief based on ineffective assistance of trial counsel (Ground Two). The Court therefore considers Ground Two in light of the new evidence, and the new ground for relief based on actual innocence.

**A.** **Freestanding Claim of Actual Innocence**

The California Supreme Court's summary denial of Petitioner's most recent state habeas petition was the last reasoned decision on this claim.

**1.** **Legal Standards**

The Supreme Court has not recognized a freestanding claim of actual innocence in the federal habeas context.

> Federal habeas review of state convictions has traditionally been limited to claims of constitutional violations occurring in the course of the underlying state criminal proceedings. Our federal habeas cases have treated claims of "actual innocence," not as an independent constitutional claim, but as a basis upon which a habeas petitioner may have an independent constitutional claim considered on the merits, even though his habeas petition would otherwise be regarded as successive or abusive. History shows that the traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency.

*Herrera v. Collins*, 506 U.S. 390, 416-17 (1993); *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014) (leaving open whether freestanding actual innocence is cognizable). Given that the Supreme Court has not recognized a freestanding actual innocence claim, the California Supreme Court's decision cannot be contrary to, or an unreasonable application of, United States Supreme Court precedent.

Assuming actual innocence could form the basis of a cognizable ground for relief, "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Herrera*, 506 U.S. at 417. In *Herrera*, the petitioner had not met his burden by presenting affidavits obtained approximately eight years after trial. The affidavits "must be considered in light of the proof of petitioner's guilt at trial." *Id.* at 418. The Court concluded that the trial evidence, "even when considered alongside petitioner's belated affidavits, points strongly to petitioner's guilt." *Id.* The affidavits contained inconsistencies and "fail[ed] to provide a convincing account of what took place on the night [the officers] were killed." *Id.* Moreover, there was insufficient explanation as to why the affiants waited so long to make their statements. *Id.* at 417-18.

After *Herrera*, the Supreme Court held that a freestanding claim of actual innocence may overcome expiration of the statute of limitations. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). The Court noted that "tenable actual-innocence pleas are rare." *Id.* "'[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995); citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Timing is "a factor relevant in evaluating the reliability of a petitioner's proof of innocence." *Id.* at 399. Actual innocence "requires 'new reliable evidence – whether it be exculpatory scientific

3

evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'" *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 324). The habeas court considers all of the evidence, both old and new, to determine whether the petitioner has met his burden of showing that it is "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *Id.* at 538. "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.*

In *House*, the Court concluded that the petitioner's evidence – which was far stronger than the evidence presented in this case – "falls short of the threshold implied in *Herrera*" although it was sufficient to overcome procedural default. *Id.* at 555. The Ninth Circuit has "held that, at a minimum, the petitioner must 'go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.'" *Jones*, 763 F.3d at 1246 (citation omitted). The Circuit applies the standards in *Schlup* and *House*. *Id.* at 1246-48.

### 2. **Analysis**

Assuming that a freestanding claim of actual innocence is cognizable under federal habeas review, Petitioner does not affirmatively show that he is probably innocent but rather attempts to cast doubt on some of the evidence against him. The totality of the evidence, both old and new, does not satisfy Petitioner's burden of showing that he is probably innocent of the attempted murder counts.[1] The state court's decision was not contrary to, or an unreasonable application of, United States Supreme Court precedent and was not an unreasonable determination of the facts.

Petitioner was convicted of four counts of premeditated attempted murder of Officer Johnson, the police officer who executed a search warrant at

---

[1] Petitioner's new evidence does not address the other counts.

4

Petitioner's home on June 25, 2009 and found drugs, a firearm, ammunition and other items in a safe that resulted in charges being filed against Petitioner.

The attempted murder counts were based on events on February 23, 2010 (Count 7), March 5, 2010 (Count 9), June 3, 2010 (Count 11) and July 6, 2010 (Count 12).[2] The prosecution must prove beyond a reasonable doubt that (1) "[t]he defendant took at least one direct but ineffective step toward killing a person," and (2) "[t]he defendant intended to kill a person." (Report at 13 (citing LD 1 at 1165).)

Lethality of Weapons

Petitioner argues that the prosecution failed to prove that the three zip guns and one M29 rocket used in the attempted murder counts were capable of being lethal. California law does not require that the means used were lethal. A "person may be convicted of an attempt to commit a crime he never could have completed under the circumstances." *People v. Chandler*, 60 Cal. 4th 508, 517 (2014). "[T]he specific intent required by the law of attempt does not require a showing that the intended act would be effective in completing the target crime. . . . If a defendant had tried to kill another person by using poison but misjudged the amount of poison necessary to kill, the defendant's misapprehension would not be a legal barrier to an attempted murder conviction. The defendant might argue that his use of insufficient poison casts doubt on whether he actually intended to kill, but assuming sufficient evidence to the contrary, a jury could find that the defendant, despite his misapprehension, had a specific intent to kill." *Id.*

A zip gun is a homemade gun constructed from materials such as metal or PVC plastic, and has a mechanism that fires a bullet. Investigator Elmore, a

---

[2] Sergeant Quinn testified that every incident was on or before a scheduled court appearance in Petitioner's drug case. (RT 1248.)

firearms expert, testified that a zip gun is no less lethal than a regular gun.[3]  (RT 424-26.)  He also described the essential components of a zip gun and how they functioned.  (RT 1323-24.)  On cross examination, Petitioner testified that any round is capable of killing a person.  (RT 1875.)

The zip gun found on February 23, 2010 ("zip gun 1") had an outer barrel, an inner barrel, elastic bands, and a firing pin set to activate when the gate opened a certain distance.  (RT 434-38, 446-47, 456, 682.)  Officer Johnson was typically the first officer to arrive and open the gate.  (RT 250-51, 371.)  On February 23, however, Officer Johnson received a request to testify as an expert and asked permission to go directly to court instead of reporting to the gang task force building.  (RT 372.)  When Sergeant Hess opened the gate on February 23, he heard a gunshot.  (RT 376-77; *see also* RT 577.)  Based on the location and firing line of the zip gun on the fence, Sergeant Hess testified he would have been struck had he stood in front of the gate to open it.  (RT 380-81; *see also* RT 442.)  An expended .357 casing was found in the device, and a .38 projectile was found in the line of fire.  (RT 386, 459-60, 482, 486, 493, 524-25, 578.)

The zip gun found on March 5, 2010 ("zip gun 2") had fallen off Officer Johnson's vehicle.  (RT 278, 327, 546; *see also* RT 636-41.)[4]  It had an outer barrel, inner barrel, rubber bands, an improvised firing pin and a cartridge.  (RT 566-67, 570.)  It was nearly identical to the zip gun found on February 23, 2010 except that one had to manually push the fence to get the lanyard to pull the release pin on February 23, 2010, whereas the device on March 5, 2010 operated on gravity to fire.  (RT 623-24.)  The cartridge was a .30-06 rifle cartridge, a larger caliber round.  This type of round can pierce a passenger

---

[3]  *See* Cal. Penal Code §§ 16590(z), 17360, 33600, 33690.

[4]  The prosecution presented evidence indicating the zip gun had been positioned near the left front wheel.  (RT 756.)

compartment of a vehicle.  (RT 625, 627, 1338.)  Although the zip gun was not tested for safety reasons under the lab's policy (RT 725), Investigator Elmore saw nothing in the mechanism or components that would prevent the zip gun from working.  (RT 669.)

On June 3, 2010, fire personnel extinguished a fire on the north portion of the roof of the Los Altos Market.  (RT 770-71.)  The gang task force building, where Officer Johnson worked, was about 100 yards away, and Officer Johnson's car was in the parking lot.  (RT 808, 810.)  On the roof of the market, there was a rocket, torch, and a pallet propped up against a pole, which was itself propped up against the wall.  (RT 906.)  The fire burned a tree and pallets, and caused heavy smoke damage to the walls.  (RT 809.)  Deputy Lawson, who worked on the hazardous device team, testified that the rocket was an M29 practice rocket that simulates the ballistic characteristics of a live round but would not explode on impact.[5]  (RT 774-75, 795.)  The warhead was empty and had no explosive components.  (RT 786.)  The M29 rocket is fired out of a rocket launcher toward a target and can travel up to 800 meters.  A rocket launcher would have either a motor or a propellant such as black powder, and a fuse.  (RT 786-87.)  Deputy Lawson found an MAPP gas cylinder, which is propane or butane with a flame, and pieces of hobby fuse.  He opined that someone tried to light the rocket.  (RT 790-91, 799.)

On July 6, 2010, Officer Johnson took his car in for service.  (RT 304, 1271.)  The mechanic found a device near the left front tire on the undercarriage of the car with metal strapping to keep it in place.  (RT 1273-75.)  The zip gun ("zip gun 3") was similar to zip gun 1 and zip gun 2 except that it had two outer barrels and two inner barrels.  It contained two high-caliber .30-06 bullets that

_____

[5] The M29 practice rocket is a bit larger than a bazooka and has the same dimensions as a regular rocket.  (RT 781, 793.)

7

were stamped TW54 (Twin Cities arsenal, year 1954), the same cartridge found in zip gun 2.[6] (RT 1280, 1285-86, 1325-26, 1340.) Zip gun 3 had all of the components necessary to fire. The bullets fit snugly in the barrel, which would enable the firing pin to hit the rounds. Investigator Elmore found no reason zip gun 3 would not work. (RT 1326-28, 1333-34.) Zip gun 3 had operated but misfired. The firing pin hit the primer and the bullets were intact, indicating the powder charge did not ignite in the bullet. (RT 1334-35.)

Petitioner argues that the projectile found after the discharge of zip gun 1 was too close to have been fired from it. Petitioner submits (1) a declaration dated October 19, 2014 from his uncle's friend, Mr. Ganz, about ballistic information for a .357 bullet fired from a height of 66 inches found on a website called gundata.org (Dkt. No. 4-1 at 84); (2) information apparently printed out from gundata.org. (*id.* at 63-82); (3) a declaration from his mother, Ms. Smit, with measurements of the intersection of Buena Vista and St. John Place (*id.* at 86); and (4) a declaration dated June 7, 2014 from a family friend, Mr. Mathey, indicating he shot three slugs out of a sling shot and the slugs flew about 320 feet, 376 feet and 380 feet, respectively (*id.* at 91). Even assuming this new evidence could be admissible, it does not undermine the evidence that zip gun 1 fired and contained an expended .357 casing in it. Petitioner agreed that a .357 round is capable of killing a person. (RT 1875.)

Additional Evidence Linking Petitioner to Crimes

Petitioner's DNA was consistent with the DNA found on the tape removed from the inner barrel of zip gun 1. (RT 854, 859-60, 890, 895-96, 884, 900, 1395, 1401, 1408, 1410.) DNA found on zip gun 2 was consistent with both Petitioner and his girlfriend. (RT 1412-13.) Petitioner was a possible contributor to DNA

---

[6] Investigator Elmore found that the TW54 rounds were available only from one surplus ammunition dealer in Long Island, New York. (RT 1342.) Twin Cities stopped manufacturing the ammunition in the 1960s. (RT 1344.)

found on black tape from the rocket incident on June 3, 2010. (RT 1413-15, 1433, 1476.)

Corporal Victorio testified that on November 11, 2010, he inspected certain handwritten mail at the prison. (RT 1484-85.) A handwriting expert testified that certain handwriting on the documents matched Petitioner's handwriting (RT 1492, 1494, 1497), and Petitioner testified he wrote those portions. (RT 1805-06). In general, the documents discussed arranging an attack on the officer's home. (RT 1508-09.) "I really don't care what happens to the place as long as it looks like it is linked to the Hemet attacks. I have a zip gun halfway made with ammo to match the Hemet attacks. It only needs a three quarter inch by five inches long piece of pipe with a screw put in the back of a cap." (RT 1509.) "I will draw his house out . . . . I wouldn't do anything if children were involved either. That's why I rigged his squad car." (*Id.*) "The house could have a security system, and he usually drives an undercover car. It changes." (RT 1510.) "Detective Johnson used to live in Hemet. He moved to Rialto after the bomb on his car was found. He has a video camera system on the front of his house." (*Id.*) Officer Johnson confirmed that the documents accurately depicted his home and neighborhood (including the U.S. Marines flagpole in his front yard), accurately described his work and home schedule, accurately described his wife's schedule, accurately reported that he drove undercover cars, and accurately stated that his child was a teenager. (RT 1564-65, 1568-69, 1571.) Petitioner acknowledged that the description of the pipe (three-quarter-inch pipe by five inches) was exactly the pipe used in the zip guns and the dimensions had not been published in the newspaper. (RT 1970.)

Petitioner testified that the other inmate said "he could do whatever I wanted to do." (RT 1809.) Petitioner responded to his offer by writing the documents. (RT 1811-12.) Petitioner wanted someone to spray paint and shoot

off a zip gun or throw a zip gun on Johnson's front yard so people would think they had the wrong person. (RT 1825, 1982.) Petitioner testified the shoestring used in zip gun 2 looked familiar from his house or boots. He thought his girlfriend's DNA got on it because she used to untie his boots after work. (RT 1902.)

Mr. Guillen testified that, in May-June 2010, he was living at Mr. Brackney's home on Highway 74. Hansen and his girlfriend Vicki also lived there. (RT 1062-64.) On the Sunday of Memorial Day weekend, Hansen called Mr. Brackney at least three times. (RT 1068-70.) Later that day, Mr. Guillen spoke to Hansen directly. Hansen said he and Nick (Petitioner) were on a roof in downtown Hemet. He was trying to build a launch tube for a rocket that would send it straight, and wanted to know how to fire a rocket. They were aiming it at the Hemet police department and wanted to hurt a particular officer. He said the rocket was not working and did not know why. (RT 1074-75, 1077-79, 1100-01.) Mr. Guillen knew Petitioner and had seen him at Mr. Brackney's property. (RT 1075.) When he was interviewed, Mr. Guillen gave police the last three digits of Petitioner's license plate. (RT 1076.) Petitioner said he had been busted for marijuana. Petitioner was "pissed off at the officer because he was screwing up his life" and wanted to prevent the officer from testifying. (RT 1081-84.) Hansen said he was the middleman for the sale of a rocket, selling it to Petitioner for $3000. When the rocket did not work, Petitioner wanted his money back.[7] (RT 1085, 1087, 1089.)

Co-defendant Hansen pled guilty to Count 11 (attempted murder of Johnson on June 3, 2010) and was sentenced to 20 years in state prison. (LD 1 at 1228-32.) Petitioner submits the declaration of Mr. Hansen dated August 17, 2016, over four years later. (Objections, Dkt. No. 36 at 48-49; State Habeas

---

[7] Mr. Guillen did not inform police until he was detained on July 2, 2010. Until that point, "I thought mostly these people were just full of shit or smoking too much speed." (RT 1104.)

Petition, Dkt. No. 37-1 at 48-49.)  The declaration confirms that Mr. Guillen was Mr. Brackney's caregiver and took care of the property.  The declaration does not deny the substance of Mr. Guillen's trial testimony.

The first witness who identified Petitioner to police was Ms. Dickenson. She testified at trial that Petitioner said he was upset that a rocket hadn't worked and asked about getting a replacement rocket or rocket launcher.  (RT 918-20.) He approached her because her husband Crash was associated with Vagos.  (RT 920.)  Petitioner said "that cop" ruined his life.  Petitioner felt he would go to prison for weed, and couldn't let that happen.  Petitioner did not mention the cop's name but said he was on the gang task force.  (RT 922-23.)  Petitioner said he had rigged two cars.  (RT 921.)

Dickenson testified that this conversation with Petitioner occurred at a property near Highway 74 where Hansen lived.  (RT 999.)  She took a citation she found in Petitioner's name and wrote down his full name, driver's license number and identifying information on a piece of paper.  (RT 927.)  Dickenson later approached police when she went to court on her own fraudulent check case on June 24, 2010.  (RT 929-32.)  Her "big motive" was the $200,000 reward being offered.  (RT 973.)  At a later traffic stop, she dropped the piece of paper on the ground for police before leaving with her husband.  The paper was marked as People's Exhibit 19.  (RT 936, 938.)  After Sergeant Quinn received information on July 2, 2010, about Petitioner's DNA and zip gun 1, Petitioner was arrested. (RT 997.)

Petitioner now submits a declaration from "Joyce Dickerson" dated December 8, 2018.  Assuming the declaration is from Joy Dickenson and is authentic, the declaration states that she "was under duress and threat by D.A. Prosecution" and "never met [Petitioner] at any time nor been introduced through Vicki Jenkins."  (Objections, Dkt. No. 36 at 15; State Habeas Petition, Dkt. No. 37-

1 at 15.)  Petitioner also submits a declaration from Vicki Jenkins dated January

22, 2017, in which she denies having introduced "Joyce Dickerson" to Petitioner.

(Objections, Dkt. No. 36 at 51-53 ¶ 18; State Habeas Petition, Dkt. No. 37-1 at 51-

53 ¶ 18.)

The two declarations would not likely have a material impact on the jury for

at least five reasons.  First, Ms. Dickenson's declaration does not disclose any

"duress and threat" by the prosecution.  There is no evidence that police

suspected Petitioner was involved in the attacks before Ms. Dickenson

approached police on June 24, 2010.  Ms. Dickenson's trial testimony that she

was the one who approached police when she arrived at court in her fraudulent

check case and that her "big motive" was the $200,000 reward makes logical

sense.  Second, although Ms. Dickenson's declaration states she never met

Petitioner at any time, the declaration does not explain how she knew the

information she gave to police and how she was able to provide Petitioner's

identifying information in writing to police.[8]  Third, the incriminating information

she gave at trial was consistent with Mr. Guillen's testimony.  Fourth, the jury

heard defense counsel's intensive and thorough cross examination of Ms.

Dickenson that undermined the credibility of her testimony, including her belief

that the reward would not be paid unless Petitioner were found guilty and that her

information about Petitioner's statements could have come from Vicki, with whom

she spoke before allegedly meeting Petitioner.  (RT 938-46, 954-67, 979-84.)

Fifth, as discussed below in connection with Ground Two, in the highly unlikely

event any defense counsel would call Ms. Jenkins to the stand, the damage from

---

[8]  When Petitioner was asked how much of Dickenson's testimony about
assaulting police officers was true, Petitioner responded that only five words she
said were true:  her name, Petitioner had a blue Jeep, she was friends with Vicki,
she had a daughter (although Petitioner was not sure it was a daughter or son)
and her husband's name was Crash.  (RT 1784-85.)  A jury could reasonably
infer that Petitioner knew Dickenson.

12

her statements to police far outweighed anything favorable she could have said about not introducing Ms. Dickenson to Petitioner.[9]

The declarations from Mitchell Sommer dated October 24, 2018 and from Jerry Lang dated October 10, 2018 would have little if any impact. (Objections, Dkt. No. 36 at 20-21, 23; State Habeas Petition, Dkt. No. 37-1 at 20-21, 23.) Mr. Sommer initially testified at trial, consistent with his declaration, that he did not hear anything about anyone being targeted, including the Hemet police department or a police officer. (RT 1133-34; Dkt. No. 36 at 20 ¶ 5.) Only after he was impeached at trial with his interview with police did Mr. Sommer confirm the statements attributed to him in the transcript and elaborate. He also heard that Hansen was doing a favor for Petitioner and "it" was a dud. (RT 1135, 1137-38, 1140-42.) Although the declaration states that he feels defense counsel should have recalled him to the stand to "clarify" his testimony, there is no reason to believe his testimony would have proceeded any differently a second time around. The prosecution would have been given another opportunity to impeach him and repeat his statements to police in front of the jury. Moreover, Mr. Sommer testified on redirect that it was hard for him to testify about the conversations he overheard in front of Petitioner because he had been threatened. (RT 1174.) In other respects, Mr. Sommer's trial testimony was consistent with his declaration. He told police he saw a rocket launcher that was an Army green tube, and the launcher was shown in People's Exhibit 139A. He never saw a rocket. (RT 1136-37, 1150; Dkt. No. 36 at 20 ¶ 3.) Petitioner submits a declaration from Meghan Magrann dated February 3, 2017. (Objections, Dkt. No. 36 at 17-18; State Habeas Petition, Dkt. No. 37-1 at 17-18.) Ms. Magrann states that she dated Mr.

_____

[9] Petitioner also submits the declaration of Ms. Hernandez, his girlfriend, stating that she is "aware" that Petitioner allowed Hansen to borrow his Jeep to move on June 27. Ms. Hernandez does not state any basis for her personal knowledge as distinguished from information told to her by Petitioner, and does not state when she became "aware" of this information.

13

Sommer in June 2010. He was a habitual liar and an alcoholic, he lacks all credibility and he has been convicted of violent offenses. (Objections, Dkt. No. 36 at 18 ¶¶ 10-12.) Mr. Sommer admitted at trial that he pled guilty to misdemeanor domestic violence and was currently on probation. (RT 1143-44.) Mr. Sommer did not deny having had a drink when he overheard the conversation, but testified he remained sober that evening because he had to work the next day. (RT 1186-87.) Finally, Mr. Sommer's declaration states that Petitioner and his girlfriend told him how much they paid for the Suburban in June 2010, but that information would be inadmissible hearsay offered by the defense.

Mr. Lang initially testified at trial that he did not recall overhearing a conversation between Petitioner and Hansen. (RT 1204, 1208.) Only after being shown his interview with police did Mr. Lang recall Hansen bringing over a rocket launcher. (RT 1205-06.) He generally did not recall the rest of the statements attributed to him in the police interview. (RT 1220-21.) He testified, consistent with his declaration, that he had been in the hospital for 1½ months, had almost died and was an alcoholic. (RT 1209-10.) At trial, Mr. Lang did not recall why money was an issue, or how much money was at issue. (RT 1206.) The declaration now states that Hansen asked $300, not $3000, without any explanation as to how Mr. Lang recalls that amount seven years after his trial testimony. Even so, the declaration does not add any new information. Both amounts ($300 and $3000) were before the jury. The declaration adds that Petitioner and his girlfriend told him what they paid for a Suburban. However, such testimony would be inadmissible hearsay offered by the defense.

The newspaper articles dated January 29 and February 1, 2018 are inadmissible hearsay, do not mention any officer who testified in Petitioner's case and involve events that occurred in 2017. (Objections, Dkt. No. 36 at 25-27, 42-43; State Habeas Petition, Dkt. No. 37-1 at 25-27, 42-43.)

## B.  Ground Two:  Ineffective Assistance of Trial Counsel

The Report sets forth the applicable legal standards.  (Report at 18-20.)

Petitioner has not shown deficiency or prejudice.  The state court's decision was not contrary to, or an unreasonable application of, United States Supreme Court precedent and was not an unreasonable determination of the facts.

Petitioner argues that trial counsel failed to conduct a proper investigation to uncover the facts contained in the declarations attached to objections and state habeas petition.  As discussed above, Ms. Dickenson submits a declaration dated December 8, 2018 (over seven years after she testified at trial) stating that she never met Petitioner (Objections, Dkt. No. 36 at 15; State Habeas Petition, Dkt. No. 37-1 at 15) and Ms. Jenkins submits a declaration dated January 22, 2017 stating that she never introduced "Joyce Dickerson" to Petitioner (Objections, Dkt. No. 36 at 51-52 ¶ 18; State Habeas Petition, Dkt. No. 37-1 at 51-52 ¶ 18). Defense counsel attempted to get Ms. Dickenson to admit that she never had a conversation with Petitioner and made up the story but Ms. Dickenson stood by her trial testimony.  (RT 983-85.)  Defense counsel's cross examination undermined her credibility by pointing out:  (1) her "big motive" was the $200,000 reward; (2) her belief was that Petitioner had to be convicted in order for the reward to be paid; (3) she told police it would be great if they could get the code enforcement bureau off her back; (4) her testimony was that Petitioner made incriminating statements moments after meeting her for the first time; (5) Vicki discussed the rocket attack and general attacks on the Hemet police department with Ms. Dickenson just before her conversation with Petitioner; (6) she pled guilty in her fraudulent check case and was on probation; and (7) she never told her husband about her conversation with Petitioner.  (RT 940-45, 954, 964, 966-67, 973, 979-80, 982-84.)  Defense counsel also impeached her with her prior statements to police.  (*E.g.*, RT 957-58 ($300 versus $3000).)  Petitioner does not

suggest anything more defense counsel could have done to impeach Ms. Dickenson's credibility.

Even if Ms. Jenkins would have been willing to testify that she did not introduce Ms. Dickenson to Petitioner, defense counsel could reasonably decide not to put Ms. Jenkins on the stand. (Report at 25 n.9.) Ms. Jenkins was interviewed by police and said Petitioner was "a fucking idiot" who did it because he was "a cry baby, he is looking for a slap on the fucking hand for a first time fucking offense for pot plants" and he did it in a way that would "make it look like the Vagos." (Dkt. No. 4-2 at 113, 118.) Petitioner also said "something stupid about a zip gun" and "getting rid of a detective that was on the case." (*Id.* at 114.) Petitioner said he went so far as "to follow this guy home," referring to the detective, and later said Petitioner mentioned following the police officer home to Rialto. (*Id.* at 113, 116.) Ms. Jenkins was prepared to testify against Petitioner, "no problem." (*Id.* at 118.)

As the Report points out, Mr. Hansen was a co-defendant who was represented by separate counsel. Petitioner was tried first, and there is no indication Mr. Hansen would have been prepared to waive his Fifth Amendment rights and testify in Petitioner's trial. Moreover, Mr. Hansen's declaration does not undermine Mr. Guillen's testimony in any way.

As discussed above, and as discussed in the Report, the declarations of Mr. Sommer, Mr. Lang and Ms. Magrann do not contain new information.

Petitioner submitted a declaration dated January 3, 2019 from Ms. Hernandez, his girlfriend. The declaration provides little information about the merits of the case. She testified at trial, and argues that defense counsel should have pointed out at trial that the prosecution threatened to prosecute her for attempted murder, and that she had been arrested on the "ridiculous charge of my DNA on a shoe lace that belonged to [Petitioner]." (Objections, Dkt. No. 36 at

16

29-32; State Habeas Petition, Dkt. No. 37-1 at 29-32.) As discussed above, Ms. Hernandez's DNA matched a mixture found on a shoe lace used in zip gun 2. (RT 1412-13.) Linking the shoe lace to Petitioner would hardly be helpful to him. Before Ms. Hernandez testified at trial, the prosecution objected to evidence of her arrest as irrelevant because there was not sufficient evidence for third party culpability. Defense counsel stated that while he was not interested in the arrest per se, he should be allowed to question her about her intent because he was concerned the jury would otherwise use the evidence of her DNA on the shoe lace and the fact that she was Petitioner's girlfriend against Petitioner. On the other hand, if the jury believed her denial then the jury could infer that Petitioner also did not have the requisite intent. The court ruled that defense counsel could question her about intent.[10] (RT 1584.)

Ms. Hernandez states she could have testified that she was present when Petitioner paid $3000 cash for a Suburban. The evidence was conflicting as to whether Petitioner paid $300 or $3000 for a rocket. Ms. Hernandez criticizes defense counsel for failing to get DMV records. There is no evidence of any corroborating DMV records. The purchase of a Suburban was the subject of a December 2, 2011 hearing on Petitioner's *Marsden* motion. (Report at 24-25.) Petitioner acknowledged that he never received a pink slip from the seller or registration from the DMV for the Suburban. (Dkt. No. 4-2 at 87-88, RT 2360-61.) Petitioner complained, as Ms. Hernandez does in her declaration, that defense counsel did not question her about the Suburban at trial. (Dkt. No. 4-2 at 87, RT 2360.) Defense counsel explained that his investigator talked to the last known owner of the Suburban, who stated Petitioner was not the person to whom he sold

---

[10] The prosecution also objected to Ms. Hernandez testifying about what other witnesses said to her about intimidation. Defense counsel responded that he did not intend to question her about that. (RT 1584-85.) Petitioner has not shown that Ms. Hernandez's hearsay testimony would be admissible.

the Suburban. (Dkt. No. 4-2 at 96, RT 2369.) Ms. Hernandez's declaration states she "recently learned" from Petitioner that he purchased the suburban from a "middle man" and not the owner listed on the registration. (Dkt. No. 36 at 31 ¶ 6; State Habeas Petition, Dkt. No. 37-1 at 31 ¶ 6.) The middle man is not identified. As the Report noted, the cash withdrawal occurred on May 20, 2010, more than one month before Petitioner's arrest on July 2, 2010 and the date he contends he added a car to his insurance policy on June 29, 2010. (Report at 25 n.8.)

Petitioner submits a declaration from his mother dated January 4, 2019 and emails previously submitted with the Petition. (Objections, Dkt. No. 36 at 34-40, 45-46, 55-63; State Habeas Petition, Dkt. No. 37-1 at 34-40, 45-46, 55-63.) The declaration does not provide any new information. The allegations were addressed by the Superior Court in hearings. (Report at 20 n.3, 28-29.) For example, defense counsel explained to the court that he had "hung up" on Petitioner when the conversation became argumentative and unproductive. Defense counsel's email gives the same explanation. (Dkt. No. 4-2 at 94-95, RT 2367-68; Objections, Dkt. No. 36 at 61; State Habeas Petition, Dkt. No. 37-1 at 61.) Ms. Smit complains that defense counsel did not call approximately 10 witnesses on Petitioner's behalf, but does not explain what favorable testimony they could provide based on their personal knowledge.[11]

---

[11] Ms. Smit complains that defense counsel refused to advise her how much time he spent with Petitioner before and during trial. The Report notes that, at defense counsel's request, the court arranged time every day after trial for Petitioner to talk to counsel. (RT 151-52, 155-56, 161-62.) During trial, defense counsel explained to the court that delays at the jail due to Petitioner's unusual housing issue were "burning up what time we have" and requested that the court end at 3:30 p.m. so he could have adequate time to see Petitioner. The court addressed the issue with the appropriate deputies, who agreed to post a notice to advise that defense counsel could see Petitioner and assured the court there would be no more problems. (RT 560-64, 609-13.) Defense counsel gave the same explanation in an email. (Objections, Dkt. No. 36 at 61; State Habeas Petition, Dkt. No. 37-1 at 61.) Defense counsel stated that telephone logs and visitor logs would be in the possession of the County if such documents exist. (Objections, Dkt. No. 36 at 70; State Habeas Petition, Dkt. No. 37-1 at 70.)

Petitioner has not shown a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). None of the declarations undermine the main evidence against Petitioner from his writings, his DNA, Mr. Guillen's testimony and the cumulative evidence of Petitioner's consistent statements to other people who spoke to police on July 2, 2010.

**C.  <u>Remaining Objections</u>**

Petitioner complains that he has been unable to produce additional records to support his grounds because "they have not been released to him." (Obj. at 4.) Petitioner does not describe the records or why those records are material to any ground for relief.

**II.**

**PETITIONER'S PROPOSED FIRST AMENDED PETITION**

On August 14, 2019, Petitioner constructively submitted a proposed First Amended Petition for Writ of Habeas Corpus with his declaration dated August 13, 2019. Petitioner did not file a motion for leave to file the First Amended Petition, which was lodged. (Dkt. No. 40.)

Subsequently, Petitioner constructively filed, on August 18, 2019, a document entitled "Petitioner Request Permission to Amend His Federal Petition Pursuant to Fed. R. Civ. P.[] 15" and lodged a First Amended Petition. (Dkt. No. 41, back of envelope.) Petitioner explains that he was transferred to a different institution, where he found an inmate who helped him litigate his grounds for relief. (Smit Decl. ¶ 3, Dkt. No. 41-1 at 29.)

The court addresses the First Amended Petition attached to the motion because it contains exhibits not included with the first lodged amended petition and is otherwise the same. (Dkt. No. 41-1.) The First Amended Petition deletes Grounds Four, Five, Seven and Eight in the original petition, re-numbers Ground

Six as Ground Four, and deletes some exhibits attached to the original petition. The First Amended Petition cites exhibits and arguments in the original petition, and therefore it appears Petitioner does not intend to omit those arguments and exhibits from this case. Therefore, the court construes the First Amended Petition as additional grounds for relief. It appears that most, if not all, of Petitioner's additional grounds are unexhausted. Nevertheless, unexhausted grounds may be denied on the merits when, as here, it is perfectly clear that the grounds are not colorable. *Cassett v. Stewart*, 406 F.3d 614, 623-24 (9th Cir. 2005).

### A. GROUND ONE: Conflict of Interest

The Report noted that Petitioner had not shown an actual conflict of interest that adversely affected his counsel's performance under *Cuyler v. Sullivan*, 446 U.S. 335 (1980). (Report at 17-18.)

Petitioner attaches as Exhibit I a letter from his counsel dated February 28, 2013, long after trial,[12] in response to Petitioner's request for a copy of his file. In that letter, defense counsel noted Petitioner's threat to file a complaint with the State Bar "as I noted your threats to my safety and well-being when we were together here in Riverside County."[13] (Dkt. No. 41-1 at 79.) The Report addressed a post-trial *Marsden* hearing on December 2, 2011. (Report at 18 n.1.) Petitioner complained about a discussion he had with counsel "during the middle of trial." Petitioner told counsel that Ms. Dickenson lied when she testified Petitioner bought a rocket, and that he actually bought a Suburban. (Dkt. No. 4-2 at 85, RT 2358.) Petitioner stated counsel "became very irate with me and stormed out." (RT 2361.) Defense counsel responded that he terminated a conversation "abruptly" downstairs because "he was demonstrating threats. That

---

[12] Jury selection commenced on September 28, 2011 (RT 136, 138) and the jury's verdicts were filed on November 7, 2011 (Lodged Document 1 ("LD") 1050-69).

[13] Petitioner was housed in Riverside during trial. (RT 103, 155.)

was the reason we terminated that conversation in a very frustrated and certain and angry way." (RT 2369-70.) Defense counsel did not express fear in any way to the court. Petitioner does not identify any other instance.

In any event, the Supreme Court has not extended *Sullivan* to a defense counsel's alleged fear for personal safety and, therefore, the state court's decision cannot be contrary to, or an unreasonable application of, Supreme Court precedent. *Rowland v. Chappell*, 876 F.3d 1174, 1192 (9th Cir. 2017) ("We have held that a state court's rejection of a conflict claim not stemming from concurrent representation is neither contrary to, nor an unreasonable application of, established federal law as determined by the United States Supreme Court."), *cert. denied*, 139 S. Ct. 323 (2018). Moreover, Petitioner has not shown an adverse effect on counsel's performance in failing to investigate the case properly. A conflict that arose in the middle of trial cannot adversely affect counsel's investigation prior to trial. The court addresses Petitioner's contentions in more detail in connection with Ground Two.

## B. GROUND TWO: <u>Ineffective Assistance of Trial Counsel</u>

The First Amended Petition contains additional reasons why defense counsel was deficient.

### DNA Expert

Petitioner argues that counsel retained a DNA expert, Mr. Kern, who was working for the same entity as the prosecution's expert, Mr. Traughber. Mr. Kern testified that he worked for Human Identification Technologies ("HIT"). (RT 1652, 1681.) Mr. Traughber testified at trial that he worked for the California Department of Justice during his work in this case. (RT 824, 837.) Mr. Kern testified that Mr. Traughber had previously worked for HIT and they had since maintained a professional relationship. (RT 1654.) Petitioner has not shown that Mr. Kern had a conflict of interest or any deficiency in his work, and has not

shown that defense counsel was deficient.

Panji Boards

Petitioner was convicted of the placement of a boobytrap device (panji board) in violation of former Cal. Penal Code § 12355 (now § 20110) in Count 6. A boobytrap device was statutorily defined as "'any concealed or camouflaged device designed to cause great bodily injury when triggered by an action of any unsuspecting person coming across the device.'" Such devices "'may include, but are not limited to, . . . sharpened stakes.'" *People v. Smit*, 224 Cal. App. 4th 977, 985 (2014) (quoting former Cal. Penal Code § 12355(c)). The panji boards at issue had sharpened nails or spikes.

Petitioner complains that defense counsel failed to impeach Officer Johnson with his prior statement as to when he discovered the panji boards. Officer Johnson testified at trial that he left home at 6:00 a.m. on December 7, 2009 to go to the gym. He did not hear anything after going to sleep the night before when it was raining hard. (RT 234.) When he left the house, he saw panji boards with 6" nails or spikes that had been sharpened to a point near his family's vehicles. (RT 243-44.) He called the watch commander and didn't touch anything. (RT 245.) After officers arrived, he walked around the house with them. (RT 245-46.) The kitchen window was shattered and they saw a chrome ball bearing. (RT 246.) Additional pellets were in the driveway. (RT 247.) Officer Johnson testified he was prohibited from seeing the police reports in the investigation. (RT 331.)

Petitioner attaches pages from Detective Galletta's report dated July 4, 2010 in which he states Johnson "awoke to the sound of breaking glass at his residence" on December 7, 2009 and "later discovered" that someone had shot ball bearings through his window in an apparent attempt to awaken him and cause him to leave his home where panji boards had been placed outside. (Dkt.

No. 41-1 at 35.)

Petitioner argues that counsel was deficient because Detective Galleta's version of events "demonstrates that Johnson had time to tamper with the evidence, coat the nails with fecal matter, and broken glass from his kitchen window." (Dkt. No. 41-1 at 9.) Petitioner also argues counsel was deficient for failing to test whether the fecal matter matched Johnson's DNA and the ground glass matched Johnson's broken window. (*Id.* at 10.)

Assuming the information in Detective Galleta's report came from Johnson, Petitioner has not shown deficiency or prejudice. Petitioner's theory is farfetched. The trial evidence does not show that fecal material and ground glass were actually found on the nails. Defense counsel stated at a post-trial *Marsden* hearing that no fecal matter was ever found on the panji boards, just "something that looked like it might have been."[14] (Dkt. No. 4-2 at 96, RT 2369.) Moreover, Detective Galleta's report does not identify the time when Officer Johnson woke up and therefore cannot demonstrate that he had time to embed any substance in the nails by 6:00 a.m. Petitioner also has not shown a reasonable probability that the result of the proceeding would have been different. The prosecution was required to prove that Petitioner placed a booby trap. (RT 2196.) There was no requirement that a substance be embedded in the sharpened nails. Mr. Traughber, the prosecution's DNA expert, testified that he obtained a minimal partial profile of a few alleles on nails from one panji board, and Petitioner was excluded as a contributor. He could not obtain DNA results from nails on a second board. He obtained only one allele at one locus from nails on a third board, which was not enough to include or exclude anyone. (RT 1452.)

_____

[14] Ms. Williams, a senior criminalist at the California Department of Justice, testified that the material embedded in the nail was "likely a biological substance that I would not normally test" and forwarded it to another part of the laboratory. The material was "visually similar" to fecal material and ground glass, but she could not say what the substance actually was. (RT 675, 728, 731-33.)

Petitioner offers no motive for Johnson to embed a substance on the nails.

Zip Gun 1

Petitioner argues counsel was deficient for failing to investigate whether zip gun 1 actually fired a bullet, failing to establish that no gun shot residue or other physical evidence was found on zip gun 1, and failing to establish that there was no evidence on the .38 caliber slug that would suggest it was fired from that gun. Petitioner also complains that counsel failed to inquire as to what led Mr. Traughber to re-examine zip gun 1 for DNA evidence.

Petitioner has not shown deficiency or prejudice. Defense counsel cross examined Investigator Elmore about whether zip gun 1 had actually fired. Zip gun 1 was rigged to fire when the gate opened about halfway. (RT 437-38.) On cross examination, Elmore testified that his opinion that zip gun 1 was operable was based on three pieces of evidence. First, a .357 shell casing was found in zip gun 1. (RT 482-83.) The shell casing had a primer cap that had been punctured, consistent with firing in a zip gun as opposed to a regular firearm, and the casing was split down the side, indicating it opened during the firing process. (RT 459-60.) Second, Sergeant Hess testified that he heard a loud bang that he recognized as a gunshot when he was opening the gate. (RT 482-83; *see* RT 376-77.) Third, a .38 projectile, consistent with a .357 casing, was found in proximity to zip gun 1. (RT 482-83.)

Defense counsel attempted to undermine this testimony by establishing that zip gun 1 had not been tested to see if it was operable. (RT 491; *see also* RT 725 (explaining laboratory policy not to test fire homemade or improvised device such as zip gun for safety reasons).) Investigator Elmore conceded he did not know of any ballistics test that could match the .38 projectile to zip gun 1 because a zip gun has a smooth barrel and does not produce rifling. (RT 485.) Petitioner has not identified another valid line of cross examination as to zip gun 1's operability.

Contrary to Petitioner's argument, Traughber was questioned about what made him go back to zip gun 1 and test other components of it for DNA evidence. Traughber testified that he started testing zip gun 1 for DNA evidence on March 8, 2010. (RT 838.) He swabbed the gate around the device, the tape used to bind zip gun 1 to the gate, and the outer surface of zip gun 1 itself, including the lanyard, rubber bands and nail. He completed his report on March 24, 2010. He did not obtain a usable DNA profile to submit to CODIS. (RT 844.) On March 10, Traughber received zip gun 2 for DNA testing and completed his report by March 22, 2010. He was again unable to obtain a usable DNA profile to submit to CODIS. (RT 848, 851.) On June 4, 2010, Traughber responded to the scene of the fire at the Los Altos Market. (RT 860.)

Traughber testified that, on June 15, 2010, he "stepped back and looked at anything else that might be useful, and . . . what stood out was the black tape that was on the original barrel" of zip gun 1. (RT 852, 854.) He decided to swab the portions of tape that had *not* been exposed to the outside surface, thinking that someone might have touched the inside portion or might have deposited saliva while talking over it. The inner portion would be less likely to be contaminated by the public, law enforcement or laboratory personnel handling zip gun 1. (RT 853, 895-96, 900-01.) As of June 15, 2010, law enforcement did not suspect Petitioner in these incidents. Joy Dickenson did not come forward and talk to police about Petitioner until June 24, 2010. (RT 995-96; see RT 931-32, 935-36.) As of June 15, 2010, Traughber did not have a sample of Petitioner's DNA.[15] (RT 884-85.) When Traughber obtained a DNA profile from the tape on June 25, 2010, it was the first DNA break on the case. (RT 855-57.) He submitted the DNA profile to CODIS and received notice of a hit (Petitioner) on July 1 or 2, 2010. Traughber

---

[15] Traughber received Petitioner's DNA sample on August 11, 2010. (RT 1398-99.) Traughber swabbed all items at issue before he touched Petitioner's DNA sample. (RT 1478.)

notified police on July 2, 2010.  (RT  859-60.)

Zip Gun 2

Petitioner argues that counsel failed to investigate whether detectives monitored in real time the surveillance camera outside Officer Johnson's home on March 4, 2010.  Petitioner attaches other pages from Detective Galleta's report dated July 4, 2010.  Detective Galleta states that, prior to the zip gun 2 incident, a video surveillance camera was placed near Johnson's home.  After the incident, Galleta obtained the footage from the camera and observed that someone walked toward Johnson's house at approximately 10:11 p.m. on March 4, 2010.  The person disappeared from view for three minutes, walked toward the camera in a northerly direction, crossed the street and walked out of camera view.  (Dkt. No. 41-1 at 43.)

Petitioner offers no evidence that defense counsel failed to investigate whether police monitored the camera in real time.  Officer Johnson testified that 24-hour active surveillance of his residence and his person started *after* the zip gun 2 incident and continued until the department told him he needed to move to another residence and he actually moved out of the county around March 20, 2010.[16]  (RT 262-63, 279-80.)  Petitioner has not shown deficiency or prejudice.

Rocket

Petitioner argues that defense counsel failed to investigate why four video surveillance cameras located near the Los Altos Market – where the fire occurred and where the rocket was discovered – either did not work or had footage that could not be copied.

Petitioner offers no evidence that defense counsel failed to investigate.

_____

[16]  Johnson later moved to a different residence inside the county and then returned to work on April 21, 2010.  (RT 281-82.)  On May 6, 2010, Johnson moved again to a home in Rialto.  (RT 282.)  He was given a different car to commute to and from work in Rialto.  (RT 292.)

Petitioner attaches pages from a police report by Officer Brock regarding the fire at Los Altos Market at 126 N. Carmalita Street. Brock states he canvassed the area for video surveillance cameras and found four:

(1) A security camera mounted to the northeast side of 126 N. Carmalita near a ladder leading to the roof. The camera was motion activated. The footage "was a black screen as the motion sensor for the camera was not activated." Brock was unable to obtain a copy of the black screen. (Dkt. No. 41-1 at 50-51.)

(2) A security camera that faced south toward 126 N. Carmalita from an office at 395 E. Latham Avenue. The footage was obscured by a row of bushes, but the glow from flames appeared on camera at approximately 21:53. Four people were seen running from the north side of 130 N. Carmelita eastbound toward Juanita Street. Two females ran into the Hemet Police Department and attempted to contact dispatch by after-hours phone but left after being placed on hold. A male and female ran eastbound, and the female is seen with a cellphone to her ear. She is later identified as Ms. Grunden, who placed a 911 call to report the fire. (Dkt. No. 41-1 at 51.) Due to technical difficulties, Brock was unable to get a copy of the video. (*Id.* at 52.) Ms. Grunden later told police she did not see anyone and did not know who was responsible for the fire. (*Id.*)

(3) A camera covering the south parking lot of the Los Altos Restaurant at 129 N. Carmelita. The owner stated that the camera was not attached to a digital video recorder. (*Id.*)

(4) Several cameras to the rear of a shop at 400 E. Latham Avenue. The owner stated the surveillance system had not been operational for the past month. (*Id.*)

Petitioner has not shown a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Cameras at two locations were not operational, a camera at one

location was not activated, and the last camera showed witnesses who attempted to report the fire. There is no indication of any potentially exculpatory evidence. "[T]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111-12.

Suburban

The prosecution introduced evidence that Petitioner withdrew $3000 from his bank account on May 20, 2010. (RT 1239-40.)

Petitioner argues that defense was deficient for failing to establish that the $3,000 petitioner withdrew from his bank account was used to purchase a Suburban and not a rocket. The Report addressed this contention. (Report at 24-25.) Defense counsel stated at a post-trial *Marsden* hearing that he had his investigator contact the Suburban's last known owner, who said that he did not sell it to Petitioner and that he sold it to a guy who "lives in X, and he looks like Y." (RT 2369, Dkt. No. 4-2 at 96.) Petitioner cannot demonstrate prejudice because there is no contact information for the buyer and speculation as to whether the buyer sold the car and, if so, to whom, is insufficient. *Richter*, 562 U.S. at 111-12.

### C.  GROUND THREE:  Insufficient Evidence

The only new argument is Petitioner's contention that there is insufficient evidence to support his conviction for Count 6 (boobytrap device) because Officer Johnson could have applied fecal matter and ground glass to the nails on the panji boards himself. As discussed above, however, the statute does not require that any substance be applied to the sharpened nails on a boobytrap device.

### D.  GROUND FOUR:  Prosecutorial Misconduct

Petitioner argues that the prosecution improperly relied on a kill zone theory. The Report explained that the kill zone theory applied only to Count 8, which was dismissed after the jury deadlocked on that count. (Report at 14.)

Petitioner argues that the prosecution used knowingly false evidence to

impeach him by implying, during his cross examination, that Petitioner's .22 caliber handgun was stolen when it was in fact registered to him. The Report sets forth the applicable legal standard. (Report at 32.) Petitioner has not shown false evidence or that the prosecution knew the evidence was false. Count 1 contained a firearm enhancement. The prosecution attempted to establish that various items found in the safe – including the .22 caliber pistol – belonged to Petitioner and not someone else. On cross examination, the prosecutor asked Petitioner whether Officer Johnson inquired about the .22 caliber pistol inside the safe. Petitioner said yes. The prosecutor asked whether Petitioner told Johnson: "I bought that gun at BJs. It's not stolen." Petitioner said yes. Petitioner then volunteered that Johnson had said there was a stolen gun in the safe. The prosecutor showed him People's Exhibit 42, a photo of the gun found in the safe, and asked Petitioner whether that gun was his .22 caliber pistol. Petitioner answered: "It looks very familiar. I'd have to say yes." (RT 1841.) The prosecution did not offer any evidence at trial that the .22 caliber pistol was stolen. It was Petitioner who volunteered Johnson's statement after he answered the prosecutor's question.

Petitioner contends the prosecution presented "falsified 'kites' delivered to them from a jail house snitch" who did not appear at trial and was unavailable for cross examination. There is no evidence that the kites came from that inmate. Rather, Corporal Davalos testified that he received information from an inmate about the existence of kites. (RT 1525-26, 1557.) That day, he collected mail from another inmate named Mr. Kirk and took it to Corporal Victorio's desk. (RT 1556.) Corporal Victorio read the kites. (RT 1485-89.) As discussed above, the prosecution's handwriting expert testified that handwriting on the kites matched Petitioner's handwriting. (RT 1497.) Petitioner testified he wrote those portions. (RT 1805-06.) Petitioner has not shown that the kites were "falsified," that the

prosecution knew they were falsified, or that testimony from the inmate who alerted authorities was somehow necessary.

Petitioner argues that the prosecution must have known that "Joyce Dickerson's" trial testimony was false and designed to obtain the reward money, and should have detected her inconsistencies. The Report rejected this argument. (Report at 33.) The prosecution acknowledged in closing argument that Ms. Dickenson was not an "inherently trustworthy person" and that the offer of a reward "brought out informants from the street." (RT 2221, 2239.) He argued Ms. Dickenson could be trusted only to the extent her testimony was shown to be accurate (RT 2221-22) and further argued that the consistent statements made by her and a variety of witnesses about Petitioner was sufficient corroboration (RT 2223, 2239). The prosecutor may argue reasonable inferences from the evidence. *See United States v. Young*, 470 U.S. 1, 7 (1985).

Petitioner argues that the prosecution "manufactured photographs during trial in order to place a specific piece of evidence in a specific place and positioned in a specific manner," and "failed to clarify for the jury that it was a launch tube, not a rocket, being discussed by the petitioner's roommates." (Dkt. No. 41-1 at 24.) Petitioner does not identify any allegedly manufactured photographs and does not cite any specific statement made by the prosecution in closing argument. In closing, the prosecution stated that Petitioner and Mr. Hansen attempted to build a launch tube. (RT 2235.)

Petitioner argues that his girlfriend, Ms. Hernandez, states she overheard the prosecutor tell defense counsel to make sure she understood that if she testified she would be prosecuted for attempted murder. (Hernandez Decl. ¶ 7, Exh. M to original petition.) In *Webb v. Texas*, the sole defense witness had a criminal record and was then serving a sentence. The Supreme Court held that a defendant was deprived of due process when the sole defense witness refused to

testify after the trial judge threatened the witness that if he lied, "the Court will personally see that your case goes to the grand jury and you will be indicted for perjury"; "the liklihood [*sic*] is that you would get convicted of perjury and that it would be stacked onto what you have already got"; "[i]t will also be held against you in the penitentiary when you're up for parole"; and "the Court wants you to thoroughly understand the chances you are taking by getting on that witness stand under oath." 409 U.S. 95, 96 (1972). The Supreme Court concluded that "the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process." *Id.* at 98.

The Ninth Circuit has interpreted *Webb* to mean that "substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process." *Ayala v. Chappell*, 829 F.3d 1081, 1111 (9th Cir. 2016), *cert. denied*, 138 S. Ct. 244 (2017). Petitioner has not made the requisite showing. First, Ms. Hernandez elected to testify at trial. (RT 1593.) Second, Petitioner has not shown substantial government interference that interfered with her choice to testify. Ms. Hernandez's declaration dated November 9, 2014 stated that, on the day she testified, she was in a conference room with defense counsel. The prosecutor came in to speak with him. Ms. Hernandez overheard the prosecutor tell defense counsel that if she testified she would be prosecuted for attempted murder and they had enough evidence to convict her. After the prosecutor left, Ms. Hernandez asked defense counsel what the prosecutor meant. Defense counsel told her not to worry. "If they had something on you, you would be sitting next to Nicholas. Don't let him scare you. Make your decision on what you believe you should do." (Dkt. No. 4-1 at 43 ¶ 7.)

Although Ms. Hernandez was initially arrested as an aider and abettor, she was not ultimately charged. (RT 1578.) At Petitioner's trial on September 26,

2011, the prosecutor stated that when defense counsel put her on the witness list, "I suspected she's going to have Fifth Amendment privilege and [counsel] should be appointed."  The court appointed counsel for Ms. Hernandez.  (RT 122.)  Thereafter, her counsel represented to the court that he had talked to the prosecutor and defense counsel to get both sides' perspectives.  (RT 126-27, 129-31, 308-09.)  Before Ms. Hernandez took the stand on October 25, 2011, the court heard evidentiary issues regarding her testimony in the presence of her attorney, the prosecutor and defense counsel.  The prosecutor stated there was *not* sufficient evidence of her culpability.  (RT 1582.)  Defense counsel agreed.  (RT 1584.)  Ms. Hernandez's counsel brought her into court.  She stated on the record that she chose to testify after being advised of her Fifth Amendment rights.  (RT 1593.)  Her counsel stated that he was satisfied Ms. Hernandez "understands what's going on."  (RT 1593-94.)  The record does not indicate substantial government interference in her decision to testify.[17]

### III.

### PETITIONER'S MOTION FOR STAY AND ABEYANCE

Petitioner constructively filed, on September 1, 2019, a motion for stay and abeyance while he seeks discovery in the state courts.  (Dkt. No. 42.)  Petitioner states that he has filed a motion for appointment of counsel in the Superior Court pursuant to Cal. Penal Code § 1405.  The motion asserts that DNA testing may show that Officer Johnson put fecal matter on the nails, that zip gun 1 did not have any gun powder residue on it, and that Petitioner's DNA was placed on the tape around the zip guns.

As discussed above, there is no indication any of this evidence would be material to Petitioner's grounds for relief in his Petition, Objections and proposed First Amended Petition.  To summarize, there is no evidence that fecal matter

---

[17]  RT 1594 may be found in Dkt. No. 44-1.

with ground glass was actually on the nails in the panji boards. Moreover, the crime charged in Count 6 does not require that any substance was placed on the nails. Petitioner does not explain how his DNA was "placed" on the items from zip gun 1, zip gun 2 and black tape from the rocket incident. The first information that Petitioner was involved did not come to law enforcement until June 24, 2010. Mr. Traughber received Petitioner's DNA sample on August 11, 2010, *after* Mr. Traughber had swabbed the inside portion of the tape on zip gun 1, zip gun 2 and the tape from the rocket incident. (RT 1398-99, 1478.) There is no evidence of a gun shot residue test for a zip gun . It is recommended that Petitioner's motion for stay be denied. *See Ayala*, 829 F.3d at 1104 & n.13 ("We decline to use the stay-and-abeyance procedure outlined in *Rhines* . . . to allow [petitioner] to develop his claim based on new evidence. The proper method for obtaining relief is to seek leave to file a second habeas petition."); *Nunez v. Gibson*, 2019 U.S. Dist. LEXIS 151597, *8 (C.D. Cal. Sept. 4, 2019) (denying stay of habeas case on brink of disposition when petitioner sought stay to pursue state proceedings that could take months and failed to meet burden of showing stay was warranted).

## IV.

## ORDER

IT THEREFORE IS ORDERED that Petitioner's objections are OVERRULED and that judgment be entered denying the Petition for Writ of Habeas Corpus, including the grounds for relief in the Objections and proposed First Amended Petition, on the merits and dismissing this action with prejudice.

IT IS FURTHER ORDERED that Petitioner's motion for a stay of these proceedings be DENIED.

DATED:     October 09, 2019          /s/ RONALD S.W. LEW

RONALD S.W. LEW
United States District Judge